Clerk, please call the next case. 2-10-0-0-6-7-3-2-8-10-Walmart May it please the Court, Your Honors, Mr. Turner. My name is Amy Turnbull. I'm on behalf of the employer in this matter, Walmart. And the employer respectfully requests that this honorable court reverse the circuit court finding that the commission's decision was against the manifest weight of the evidence. The employer stands behind the standard is the manifest weight of the evidence here. And at issue for the commission was whether the employee's left hip condition, which was a labral tear and need for surgery, was causally related to the original work injury on April 1, 2005. The commission found that the employee's left hip condition was not related to the original work injury. There's a three-page decision that the commission rendered whereby they laid out their reasoning. They judged the credibility of the medical evidence. They made findings as to the opinions and credibility of the witnesses' testimony specifically in regards to Dr. Glasgow and Dr. Jacobs. And they found that Dr. Jacobs' opinions were more credible and adopted those as the opinions and therefore decided that the employee's left hip condition was not related to the work injury. As to the underlying facts and the basis for their decision, it's well settled in this particular record that prior to the work accident on April 1, 2005, the employee had a longstanding, preexisting congenital bilateral hip problem. So much so that she admitted in her testimony that at least one surgeon prior to this work injury had already recommended bilateral hip replacement. She was also an active patient of Dr. Glasgow's and had most recently seen him on March 18, 2005, approximately two to two and a half weeks before the work accident, at which point Dr. Glasgow referred her to a physician in St. Louis named Dr. Clohese, an expert for the hips, for a determination of whether he felt she was a candidate for bilateral hip osteotomy. She did have the work accident on April 1, 2005, and the employer does not dispute that. The medical records clearly document at Kishwaukee Hospital that she appeared for having fallen on her right hip. The Kishwaukee medical records are completely silent as to any complaints of pain whatsoever to the left hip. The diagnosis was a right hip sprain, irritation, et cetera. She then followed up with her treating physician for the preexisting condition as well, Dr. Glasgow, on April 7 and April 14. On April 7, the diagnosis was an irritated right hip, and there's no documentation in Dr. Glasgow's records at that time that she had complaints of left hip pain. On April 14, the last day she saw Dr. Glasgow for the right hip condition, the diagnosis at that point was a resolved right hip irritation. He released her to full duty. He did prescribe a bit of therapy for which she attended two sessions by the end of April. And by her own admission in Dr. Glasgow's records, she was back to baseline status with respect to her hip, and that was the end of it. During Dr. Glasgow's testimony, he admitted that he kept two separate files for this employee, one for her preexisting bilateral hip dysplasia condition, and one for the work injury. And the only documents in the work file, so to speak, were the April 7 and April 14 visits to his office, along with copies of the emergency room records from April 1, and I believe the two visits from therapy. Was there an opinion by Glasgow, was there a medical opinion that he came up with to establish causation, or are you saying there was no opinion establishing causation? He did come up with an opinion. He rendered a narrative report in 2007 at the request of the employee from a letter that was sent by the employee's attorney that was not within any records. The causation opinion that Dr. Glasgow rendered is that the ultimate MR arthrogram in July of that year was the right hip. And that the right hip was the cause of the work injury on April 1. You're saying it was uncertain? Does that seem... Absolutely. His testimony and what he admitted to during his deposition is that he cannot be sure that the labral tear was caused by the injury on April 1, 2005, and that it is possible that that labral tear was preexisting. That also fits with Dr. Jacobs' testimony, who indicated that it is possible for someone to receive and have a labral tear injury as the result of an acute fall, but given the mere fact that this particular individual had an extensive preexisting condition of bilateral hip dysplasia, the fact that she even has that is suggestive that she in all likelihood had a labral tear that was non-symptomatic. What is also evident, and in contradiction to Dr. Glasgow's testimony that it may be directly related, is the mere fact of his own practice in his office and how he handled her particular care. He had the two separate files, and he never put another document in her work comp file after April 14, 2005. She had that MR arthrogram of her left hip within that document. Within three months, she had it on July 1, 2005. If Dr. Glasgow all that time had believed that the left hip was connected to the right hip from the work injury on April 1, he should have kept all of those documents in the work comp file and kept it open. And he didn't do so. Specifically, also, the timeline of her treatment is that she'd seen Dr. Glasgow on March 18. He had referred her to Dr. Clohessy for the expert opinion on whether the osteotomies would be treated. The next step for her. She admitted in her testimony that she made that appointment prior to the work injury. You then have the work injury for the irritated right hip. She sees Dr. Glasgow twice for that. He discharges her to full duty for that. She says she's back to baseline status. And then in May 2005, she goes ahead and proceeds with the preexisting referral and sees Dr. Clohessy. He recommends the MR arthrogram. She has that. She sees Dr. Glasgow a couple of times thereafter and essentially kind of falls off any treatment of any kind or nature with seeing Dr. Glasgow in May of 2006. During this entire time, she works full duty and then she quits working for Walmart in October of 2006. And it's not until I believe May of 2007 when Dr. Glasgow is asked to render an opinion as to whether what was going on with her left hip would be related to the original work injury on April 1, 2005. There is clearly sufficient evidence that Dr. Glasgow even admits that it's very possible that the labral tear of her left hip was preexisting prior to the work injury. And that the ongoing treatment in her, you know, when she went to Dr. Clohessy was simply the natural progression of what was occurring for the preexisting condition. All right. So to summarize what you're saying basically, there's some conflicting medical evidence in medical reports. You're saying that it's up to the commission to assess that and determine the weight. Absolutely. What about Mr. Turner's argument inviting the court to revisit the issue of the appropriate standard of review where the commission overturns the reasoning and the facts of the arbitrator? This court has consistently denied that as a standard, this extra scrutiny and or the modified majority rule. I certainly understand Mr. Turner's argument that, you know, in a perfect world, judging an arbitrator may have a better assessment of judging a witness as correct. I certainly understand his credibility. However, this is a causation issue mostly on the medical evidence and what's in the medical records and what's not. If you, I'll concede that if you were strictly looking at whether two witnesses side-by-side giving lay testimony, one's lying, one's telling the truth, the person who's looking at them and seeing their mannerisms, that may be a viable argument. I certainly understand that and it's well settled that the commission is the proper fact-finding body to determine the witness's credibility and their opinions. The commission did so here in rendering that Dr. Jacobs' opinions were more credible. They based that in part on Dr. Glasgow's testimony, Dr. Jacobs' testimony, the petitioner's testimony, and a review of what was in the medical records versus what the petitioner, I'm sorry, the employee testified to. In order for this court, for a reviewing court to overturn a commission's decision, the opposite conclusion must be apparent. And the mere fact that there are conflicting opinions here, and Dr. Glasgow as the treating physician doesn't even have a strong opinion to say that, oh, I am adamant and it is absolute that this left hip labral tear was, you know, a result of the April 1st, 2005 work accident. He doesn't even have a strong enough opinion. He certainly says it may be a direct cause, but he clearly admits that it's very possible that it was preexisting and he can't be sure that it was related to the work accident. For those reasons, I would respectfully request that this honorable court reverse the circuit court's decision and replace that with the decision of the commission. Thank you, counsel. Counsel, please. May it please the court, Mr. Turnbull, Rick Turner for Jillian Koepp. Dr. Glasgow's opinion, the words were might or could. Dr. Jacobs, when he was asked that on cross-examination, said the same thing, that the left labral tear could just as possibly have been caused as a result of trauma. And when I asked him, would that include falling and doing the splits on a water and oil-covered floor, he said yes. So you've got both doctors in a situation where, understandably, they don't have any preexisting MRM arthrogram to demonstrate a left hip tear. Jacobs thinks it's degenerative in nature, a tear that was degenerative, but he admitted that because of the way the tear looked, it could have been due to trauma. And the fact is there is no preexisting evidence of any left hip labral tear. And you're saying the might or could language is the standard foundational language. So you're saying what's the big deal with that? Exactly. The question really is, under the existing standard, manifest weight, were there sufficient facts for the commission, before the commission, such that it was wrong for the circuit court to overturn the commission's decision on the basis of manifest weight? And my position is there aren't sufficient facts. To take an emergency room record that says she's fallen, she's complaining of mostly right hip pain, which is consistent with her testimony, I did the splits, I landed mostly on my right side. To take Dr. Glasgow's April 7th note in which he says she's complaining now again of right hip pain, and then his note of the 14th where he says she's returned to baseline with respect to her hips, and say that serves as a basis to find the petitioner's testimony incredible is wrong. She testified I was on crutches when I went into his office on April 7th. He asked me at that time, as indicated in his record, to try to wean myself off crutches. But it isn't until after April 14th that she's back at work at the deli and trying to work without crutches, and she testifies that's when I start getting increased pain. And now it's more on my left side. So that when she does present on May 18th to Barnes Hospital, the doctor's saying she's complaining more of left hip pain. Granted, she doesn't give a history of the fall. There's no indication that he asked for any type of history. The problem here is that she's already got a congenital problem with both hips that's probably going to require surgery. The issue before this court, as the issue before the commission, is not whether the employer adopts all of those problems. The sole medical treatment that we ask for in the 8A is to address that left hip tear. Dr. Glasgow testifies that should be addressed either through injections and or arthroscopy, and it should be staged before her underlying congenital hip problem has to be dealt with. That's the only issue before the court. Well, the commission's decision went through pretty thoroughly the reasons for its decision, didn't they? They did, Your Honor. And you couldn't convince two of those commissioners, which I've seen in the past have been favorable to claimants, Mr. DiMuno and Mr. Gorer? Respectfully, Your Honor, I don't think that they took into consideration the evidence that they didn't speak to. Which is the Petitioner's own testimony with respect to what she was going through. They concentrated on three medical, you know, three medical situations, the visit to the emergency room. What's wrong with that? Because, Your Honor, I don't think those are sufficient facts for the commission to have based its decision in overturning the findings of the arbitrator who went into a detailed analysis and further had the benefit of observing the Petitioner and hearing her testimony. And this does kind of tie into the argument with respect to the standard. This Court has repeatedly said, in addition to the cases cited in the briefs as recently as the R&D Thiel case last year, that we're not going to go back to Cook. Respectfully, Justice Berry had it wrong. We don't think there should be any enhanced judicial scrutiny. What I'm suggesting to this Court is, as I indicated in the argument in the brief on the standard of review, is when you have a situation where the commission's overturning the arbitrator who's had the opportunity to observe the witness and make a determination of credibility, that at a minimum, the Court of Review then has the opportunity, should have the opportunity, to explore the commission's decision vis-à-vis the arbitrator's findings on credibility and make its determination. What do you do about Hostany? Well, Hostany, I would argue the same thing, Judge. In Hostany, the Court talked about S&H floor covering and said, you know, we're not going to consider giving credence to Cook. And I'm not saying that the Court should bring Cook back. What I'm saying is, is it time for a modified rule here? When you look at the fiscal reports for the commission for the last eight years, and you see between 48 and 52 percent of the arbitration decisions are reviewed, when you see in the last six years you're going from about 1,077 to, I think, 1,700-plus commission decisions, when labor and management is arguing about the length of time it takes to get a case through the commission, is it time to look at what we're doing in terms of how we evaluate at the Court of Review the standard? Is it time to look at whether or not the arbitrator's decision with respect to credibility, with respect to this issue of causal relationship, should be given some deference? Have you got the Supreme Court case that helps you?  Do you have a Supreme Court case that doesn't help you? I have the prior decisions of the Illinois Supreme Court that talk about the fact that there is, you know, manifest weight is manifest weight. And I'm not saying get rid of manifest weight. What I'm saying is the trial court and the Court of Appeals should have an opportunity to look at the reasoning of the arbitrator and the relationship. That's what I'm saying. Thank you.